UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

QUINTON MURPHY,

    Plaintiff,

              Case No. 19-cv-1728-pp

 v.

UNITED PARCEL SERVICE, INC.,

    Defendant.

**ORDER DENYING DEFENDANT'S MOTION TO DISMISS FIRST AMENDED COMPLAINT (DKT. NO. 22) AND GRANTING DEFENDANT'S REQUEST TO STRIKE DECLARATORY RELIEF (DKT. NO. 23)**

The plaintiff, who is deaf, alleged in his original complaint that the defendant failed to accommodate his request for interpreters and discriminated against him by denying him a full-time position driving a UPS package car. Dkt. No. 1. After the defendant filed a motion to dismiss that original complaint, dkt. no. 14, the court reminded the plaintiff that he had the option of either responding to the motion to dismiss or filing an amended complaint, dkt. no. 17. The plaintiff opted to amend the complaint, dkt. no. 19, and the defendant since has moved to dismiss the amended complaint, dkt. no. 22.

The amended complaint alleges two causes of action—failure to accommodate/employment discrimination in violation of the Americans with Disabilities Act, dkt. no. 19 at 5, and disparate treatment/employment discrimination in violation of that same statute, dkt. no. 19 at 6. The amended

1

complaint seeks declaratory judgment, compensatory damages, costs and fees. Dkt. No. 19 at page 6.

The defendant moves to dismiss under Fed. R. Civ. P. Rule 12(b)(1), on the ground that the court does not have authority to decide the plaintiff's claims because he did not exhaust the grievance procedure, and under Fed. R. Civ. P. 12(b)(6), because the ground that the plaintiff fails to state a claim. Dkt. No. 23. The court will deny the defendant's motion to dismiss the substantive causes of action but will grant the defendant's request to strike the request for declaratory relief.

## I.      Request for Judicial Notice (Dkt. No. 24)

Along with the motion to dismiss, the defendant filed a motion asking the court to take judicial notice of four documents under Fed. R. Evid. 201: the National Master Agreements between the defendant and the International Brotherhood of Teamsters for 2013-2018 and 2018-2023, the Central Region Supplemental Agreement for 2018-2023 and the Department of Transportation's Federal Motor Carrier Safety Administration's rule granting certain individuals (including the plaintiff) exemptions from its physical qualifications standards for hearing for interstate drivers. Dkt. No. 24 (asking the court to take judicial notice of Dkt. Nos. 24-1, 24-2, 24-3, 24-4). The defendant argues that the authenticity of the first three documents is not in question because they are they are posted on the International Brotherhood of Teamster's website. Id. at 1. The defendant asserts that judicial notice is appropriate because the three agreements are central to the allegations in the

2

complaint. Id. at 1-2. Finally, the defendant argues that the last document is not subject to reasonable dispute because it is part of the public record. Id. at 2.

The court assumes the defendant made this request because of Fed. R. Civ. P. 12(d). "In response to an ordinary 12(b)(6) motion [to dismiss a complaint for failure to state a claim], a court simply examines the allegations in the complaint to determine whether they pass muster." Gen. Elec. Capital Corp. v. Lease Resolution Corp., 128 F.3d 1074, 1080 (7th Cir. 1997). Similarly, when a party moves for judgment on the pleadings under Rule 12(c), the court considers the only "pleadings"—"the complaint, the answer, and any written instruments attached as exhibits." Fed. Mut. Ins. Co. v. Coyle Mech. Supply, Inc., 983 F.3d 307, 312-313 (7th Cir. 2020) (quoting N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend, 163 F.3d 449, 452 (7th Cir. 1998)). Rule 12(d) mandates that in the context of motions to dismiss under Rules 12(b)(6) or 12(c), if "matters outside the pleadings" are presented to the court and not excluded, the court "must" treat the motion as a motion for summary judgment under Fed. R. Civ. P. 56. The result of such a "conversion" from a motion to dismiss under Rule 12(b)(6) or 12(c) to a motion for summary judgment under Rule 56 is that "[a]ll parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d).

There is a narrow, court-crafted exception to the rule that consideration of matters outside the pleadings requires conversion to a summary judgment

3

motion, an exception that "permit[s] a district court to take judicial notice of matters of public record without converting a motion for failure to state a claim into a motion for summary judgment." Gen. Elec. Capital Corp., 128 F.3d at 1080 (collecting cases). The exception "has allowed courts to avoid unnecessary proceedings when an undisputed fact in the public record establishes that the plaintiff cannot satisfy the 12(b)(6) standard." Id. at 1081.

The court assumes that the defendant asked the court to take judicial notice of the two master bargaining agreements, the supplement to the 2018-2023 agreement and the Department of Transportation's Federal Motor Carrier Safety Administration's decision granting the plaintiff and others exemptions from its hearing standards for interstate drivers because although the defendant wants the court to consider those documents, it does *not* want the court to convert its motion to dismiss into a motion for summary judgment. The court will grant the defendant's request to take judicial notice of the DOT's FMCSA exemption decision. Under Fed. R. Evid. 803(8)(A)(i) and (B), a "public record" is a record or statement of a public office that sets out the office's activities and anyone opposing admission of the document record does not show any indicia of lack of trustworthiness. The FMCSA exemption decision is a record of statement of the Department of Transportation—a public office—and it sets out an activity of that office—a decision to exempt certain individuals from the agency's physical qualifications standards concerning hearing for interstate drivers.

Although the plaintiff has not opposed the defendant's request, the court will not take judicial notice of the collective bargaining agreements. "Judicial notice is a powerful tool that must be used with caution." Tobey v. Chibucos, 890 F.3d 634, 648 (7th Cir. 2018) (quoting Daniel v. Cook Cty., 833 F.3d 728, 742 (7th Cir. 2016)). Judicial notice "is an adjudicative device that substitutes the acceptance of a universal truth for the conventional method of introducing evidence." Gen. Elec. Capital Corp., 128 F.3d at 1081 (citations omitted). "[T]he effect of taking judicial notice under [Fed. R. Evid.] 201 is to preclude a party from introducing contrary evidence and, in effect, directing a verdict against him as to the fact noticed." Id. at 1083 (quoting United States v. Jones, 29 F.3d 1549, 1553 (11th Cir. 1994)).

While it seems unlikely that the plaintiff would challenge the authenticity of the agreements later in the litigation—he cites the language of the agreements in his brief in opposition to the motion to dismiss, dkt. no. 25 at 8-12—the agreements are not matters of public record, and the fact that they are published on the Teamsters' web site does not make them so. The agreements are not published on the web site of a public office. See Outley v. City of Chi., 407 F. Supp. 3d 752, 767 (N.D. Ill. Sept. 9, 2019) (taking judicial notice of CBAs reproduced on the city's website). No public entity has formally adopted the agreements or enacted them into law. See Minch v. City of Chi., 486 F.3d 297, 300, n.3 (7th Cir. 2007) (taking judicial notice of a collective bargaining agreement formally adopted by the city council and not objected to by the plaintiff).

5

That said, the court does not need to take judicial notice of the agreements to consider them. The defendant relies on the agreements in arguing that the court should dismiss the complaint for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1). Dkt. No. 23 at 12-19. "[A lack of subject matter] defense can take the form of a facial or a factual attack on the plaintiff's allegations." Bazile v. Finance Sys. Of Green Bay, Inc., 983 F.3d 274, 279 (7th Cir. 2020) (citing Apex Dig., Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443-44 (7th Cir. 2009)).

> A facial attack tests whether the allegations, taken as true, support an inference that the elements of standing exist. *See* [*Apex Dig., Inc.*, 572 F.3d at 443-44]. In this way, a facial attack does not challenge the alleged facts themselves. But a factual attack does, testing the existence of jurisdictional facts underlying the allegations. *See id.* at 444. Accordingly, a plaintiff undergoing only a facial attack enjoys treatment of her allegations true, but that benefit does not carry into the context of a factual challenge. *See id.* (quoting *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir. 1977)). In that context, the court may consider and weigh evidence outside the pleadings to determine whether it has power to adjudicate the action. *See Venezuela v. Helmerich & Payne Int'l Drilling Co.*, --- U.S. ----, 137 S. Ct. 1312, 1316 . . . (2017); *Craftwood II, Inc. v. Generac Power Sys., Inc.*, 920 F.3d 479, 481 (7th Cir. 2019)).

Id.

The defendant has not mounted a facial challenge to the court's subject-matter jurisdiction; it concedes that the complaint purports to state a claim under the ADA, and because the ADA is a federal statute, the face of the complaint asserts federal question jurisdiction. The defendant argues, however, that there are facts that deprive the court of jurisdiction—facts contained in the collective bargaining agreements. Because the defendant has raised a factual

6

challenge to the court's jurisdiction, the court may consider the agreements in determining whether it has jurisdiction, even though it has declined to take judicial notice of those agreements.

## II.  **Motion to Dismiss**

### A.  Legal Standards

#### 1.  *Rule 12(b)(1)*

As noted, a motion to dismiss under Rule 12(b)(1) challenges the court's subject matter jurisdiction. Fed. R. Civ. P. 12(b)(1). Where the defendant denies the truth of the jurisdictional allegations (mounts a factual challenge), the court may look beyond the pleadings and view any competent proof submitted by the parties to determine if the plaintiff has established jurisdiction by a preponderance of the evidence. Meridian Sec. Ins. Co. v. Sadowski, 441 F.3d 536, 543 (7th Cir. 2006). See also, Bazile, 983 F.3d at 279 (7th Cir. 2020).

#### 2.  *Rule 12(b)(6*

On the other hand, "[a] Rule 12(b)(6) motion tests 'the legal sufficiency of a complaint,' as measured against the standards of Rule 8(a)." Gunn v. Continental Cas. Co., 968 F.3d 802, 805 (7th Cir. 2020) (citing Runnion v. Girl Scouts of Greater Chi. and Nw. Ind., 786 F.3d 510, 526 (7th Cir. 2015)). When evaluating a motion to dismiss under Rule 12(b)(6), the court "'construe[s] the complaint in the light most favorable to plaintiff, accept[s] all well-pleaded facts as true, and draw[s] reasonable inferences in plaintiff's favor.'" Divane v. Northwestern Univ., 953 F.3d 980, 987 (7th Cir. 2020) (quoting Taha v. Int'l Bhd. of Teamsters, Local 781, 947 F.3d 464, 469 (7th Cir. 2000)).

7

A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). In this context, "plausible," as opposed to "merely conceivable or speculative," means that the plaintiff must include "enough details about the subject-matter of the case to present a story that holds together." Carlson v. CSX Transp., Inc., 758 F.3d 819, 826-27 (7th Cir. 2014) (quoting Swanson v. Citibank, N.A., 614 F.3d 400, 404-05 (7th Cir. 2010)). The court asks whether the things could happen—not whether they did happen. Id. at 827. "It is the defendant's burden to establish the complaint's sufficiency." Gunn, 968 F.3d at 806 (citing Yeksigian v. Nappi, 900 F.2d 101, 104 (7th Cir. 1990)). The plaintiff does not bear the burden of defeating a Rule 12(b)(6) motion; the sole focus is on the allegations in the complaint. Brown v. Budz, 398 F.3d 904, 914 (7th Cir. 2005).

B.     Facts Alleged in the Amended Complaint

The defendant hired the plaintiff in 2004. Dkt. No. 19 at ¶7. The plaintiff worked in the Germantown facility, but now works in Elm Grove as package handler; he is a member of the Teamsters Local Union 344. Id. at ¶7, 9. The plaintiff, who is deaf and communicates through American Sign Language (ASL), did not have communication problems in Germantown because he had a supervisor who knew some ASL and whenever there was an important meeting, the defendant provided a sign language interpreter. Id. at ¶¶6, 7. The plaintiff began having problems with communication and the lack of interpreters once he transferred to the Elm Grove facility. Id. at ¶7. The plaintiff requested

8

interpreters for meetings and provided the human resources manager with contact information for interpreters. Id. at ¶8. On multiple occasions, the defendant failed to provide interpreters for meetings discussing promotions, scheduling, job changes, discipline and safety. Id. The failure to provide interpreters continues to be a problem for the plaintiff. Id.

The plaintiff has filed union grievances for the alleged "failure[s] to provide interpreters or appropriate communication." Id. at ¶9. At least two of the grievances went to the Wisconsin Area Panel Grievance Committee, which ruled in the plaintiff's favor and ordered the defendant to provide appropriate sign language interpretation to the plaintiff. Id. The plaintiff alleges that these orders have been followed "sporadically at best" and that there continues to be a failure to provide interpretation for many meetings, resulting in his not getting the information that his co-workers receive in daily briefings. Id. at ¶10. The plaintiff alleges that "[i]n the alternative," the defendant has failed to provide him with notes on the meetings or has provided inadequate notes. Id. at ¶11. As a result, he has missed information about schedule changes in the days of the week he was supposed to work and how to participate in incentive programs. Id. at ¶12. The plaintiff alleges that the Elm Grove facility fails to follow UPS corporate policy for deaf and hard of hearing employees and applicants, which generally requires interpreters. Id.

The plaintiff applied for three full-time driving positions in 2016. Id. at ¶¶13-14. The process for bidding on driving positions is covered by the

9

seniority system mandated by the CBAs. Dkt. No. 24-3 at 7 (Sec. 8). A vacancy must be filled be the senior bidding employee. Id.

The first two times the plaintiff bid for full-time driver positions—on August 16 and September 16, 2016—he was the most senior bidder. Dkt. No 19 at ¶13. The defendant removed the postings without explanation. Id. The third time he bid (again, as the most senior bidder), on September 27, 2016, the plaintiff took a required physical exam (and passed), then was scheduled to take a driving test. Id. at ¶¶14-15.

An applicant must complete several steps to be hired as a package car driver. He must pass the physical examination, which the plaintiff did. Dkt. No. 19 at ¶14. The applicant also must meet the hearing threshold required by the FMCSA. 49 C.F.R. §391.41(b)(11). The plaintiff obtained an exemption from the hearing requirement through an experimental program conducted by the FMCSA. Dkt. No. 19 at ¶14.

Next, the plaintiff was required to pass a driving test. Dkt. No. 19 at ¶15. When he took the test on November 7, 2016, the plaintiff requested an interpreter and asked to use a student truck because it had enough seats for the plaintiff, the tester and the interpreter. Id. The defendant refused to allow the interpreter to ride along and required the plaintiff to take the test in an older vehicle with a manual transmission. Id. When the plaintiff asked if he could practice driving with supervisors (which he says had happened in the past), the HR representative told him that option was no longer available because of liability concerns. Id. The plaintiff asserts, however, that after he

10

was told this, another driver (who was not deaf) was allowed to practice with a supervisor. Id.

The plaintiff alleges that before starting the test, the tester agreed to use hand gestures to administer directions on the test; however, the tester did not use the agreed upon gestures and used different gestures. Id. at ¶16. The tester never had the plaintiff pull over during the test to explain to the plaintiff what the tester wanted the plaintiff to do or what was to be evaluated. Id. The plaintiff says that his test was fifty-five minutes long; he says that non-deaf drivers usually had a test lasting between fifteen to twenty minutes. Id. The plaintiff did not pass the test. Id.

The plaintiff had a second driving test that was similar to the first one, except that the tester wrote notes and stuck them in the plaintiff's face while he was driving. Id. at ¶17. The tester also marked a score for the plaintiff on the uphill parking portion of the test, even though the plaintiff does not recall being directed to perform this portion of the test. Id. The plaintiff did not pass this test. Id. After the second test, the tester allegedly told others that the defendant was determined never to let the plaintiff become a company driver. Id. at ¶18.

The CBAs are negotiated every five years. Dkt. Nos. 24-1 at 2 (National Master UPS Agreement for August 1, 2018 through July 31, 2023); 24-2 at 2 (National Master UPS Agreement for August 1, 2013 through July 31, 2018). The CBAs cover package drivers, sorters, loaders, unloaders, porters, office clerks, customer counter clerks, mechanics, building maintenance personnel,

car washers and others. Dkt. No. 24-1 at Article I, Section 2; Dkt. No. 24-2 at Article I, Section 2. There is a rider to the 2018-2023 agreement which adds specific provisions for Teamster member employees in the Central Region. Dkt. Nos. 24-3.

The CBAs establish a National Grievance Procedure for "all grievances and/or questions of interpretation arising under the provisions of this National Agreement." Dkt. No. 24-1 at 33 (Article 8, National Grievance Procedure); Dkt. No. 24-2 at 28 (Article 8, National Grievance Procedure). The rider[1] to the 2018-2023 agreement defines a grievance as "any controversy, complaint, misunderstanding or dispute arising as to interpretation, application or observance of any of the provisions of this Agreement or any Supplement, Rider or Addendum hereto" and "grievance procedures may be invoked only by authorized Union or Employer representatives." Dkt. No. 24-3 at 16 (Article 5, Section 1). The process begins with a discussion between the employee and his or her immediate supervisor or shop steward. Id. If that is unsuccessful, the employee must reduce the grievance to writing and "have it submitted" to the company within five working days. Id. If the parties fail to reach a decision or agree on a settlement, it shall be submitted to the State Committee or UPS Joint Area Committee. Id. If the grievance can't be satisfactorily resolved by a majority decision of "the panel and the UPS Joint Area Committee," it shall be

---

[1] The 2018-23 national agreement provides that any grievance that does not raise an interpretation of the master agreement shall be resolved under the regional grievance procedures described in the rider. Dkt. No. 24-1 at 37 (Article 8, Section 5).

submitted to the UPS vice president of labor relations and the international director of the Central Region of Teamsters. Id. at 17 (Article 5, Section 3). If those entities cannot agree, the grievance goes to the UPS president of labor relations and the Teamsters national package director. Id. Deadlocked grievances go to the National Grievance Committee. Id. If the National Grievance Committee cannot reach a majority decision, "either party shall have the right to refer the case to binding arbitration. Dkt. No. 24-1 at 36 (Article 8, Section 3—master agreement).

    C.    <u>Analysis</u>

        1.    *Rule 12(b)(1)—Lack of Subject Matter Jurisdiction*

The amended complaint asserts that the court has jurisdiction under 28 U.S.C. §1331. Dkt. No. 19 at ¶3. Section 1331 provides that district courts have original jurisdiction over "all civil actions arising under the Constitution, laws, or treaties of the United States." The amended complaint states two causes of action for employment discrimination in violation of the Americans with Disabilities Act, a federal statute. Dkt. No. 19 at ¶¶19-22. The court has federal question subject matter jurisdiction to adjudicate alleged violations of the Americans with Disabilities Act.

The defendant argues, however, that the collective bargaining agreements between it and the Teamsters require employees to raise any disability discrimination claims under the ADA through the union grievance process—in other words, the agreements require that employees exhaust their claims through the union grievance process before filing suit in federal court. Dkt. No.

23 at 7. The defendant asserts that even though the plaintiff could and should have raised his ADA complaints through the union grievance process, he did not—he came to federal court instead. Id. The defendant characterizes the suit as an "attempt to bypass the procedure for which [the plaintiff] collectively bargained." Id. The defendant urges the court to reject the plaintiff's "bypass" attempt for three reasons: (1) it asserts that the plaintiff's claims implicate the CBAs, subjecting the claims to the Labor Management Relations Act's (LMRA) exhaustion requirement; (2) it says that the CBAs contain a clear commitment to arbitrate ADA claims before the labor-management committee; and (3) it says that the plaintiff's ability to redress his claims through the committee "may obviate his claims, making them unripe as a constitutional matter." Id. at 7-8.

### a. Failure to Exhaust Under the LMRA

The defendant argues that the Labor Management Relations Act (a statute not mentioned in the amended complaint) requires an employee to use the contract grievance procedure agreed upon by the employer and the union. Dkt. No. 23 at 12 (citing Republic Steel Corp. v. Maddox, 379 U.S. 650, 652 (1965)). The defendant asserts that a prerequisite to the plaintiff filing a claim for relief under the LMRA in federal court is the requirement that he use the contractual grievance procedures in the collective bargaining agreements. Id. (citing Roman v. U.S. Postal Serv., 821 F.2d 382, 384, 289 (7th Cir. 1987)). There are several problems with this argument.

**First**, assuming—as the defendant does—that the plaintiff is subject to a requirement that he exhaust contractual remedies before coming to federal court, the defendant relied on the wrong provision of Rule 12 for raising its failure-to-exhaust argument. "A failure to exhaust is normally considered to be an affirmative defense . . . ." Mosely v. Bd. of Educ. of City of Chi., 434 F.3d 527, 533 (7th Cir. 2006). At least one district court in the Seventh Circuit has concluded, citing the Supreme Court's decision in Jones v. Bock, 549 U.S. 199 (2007), that because the Labor Management Relations Act is silent on whether exhaustion is an affirmative defense, "the default rule that it is an affirmative defense" should apply. Thompson v. Fairmont Chi. Hotel, 525 F. Supp. 2d 984, 992 n.6 (N.D. Ill. 2007). "The proper way to seek a dismissal based on an affirmative defense under most circumstances" is that the "defendant should answer and then move under Rule 12(c) for judgment on the pleadings." Burton v. Ghosh, 961 F.3d 960, 964-65 (7th Cir. 2020) (citing Carr v. Tillery, 591 F.3d 909, 913 (7th Cir. 2010); Amy St. Eve & Mark A. Zuckerman, *The Forgotten Pleading*, 7 FED. CTS. L. REV. 152, 172 (2013)). See also, Yassan v. J.P. Morgan Chase & Co., 708 F.3d 963, 975 (7th Cir. 2013) ("Dismissing a case on the basis of an affirmative defense is properly done under Rule 12(c) . . . .").

**Second**, as the court has intimated, the plaintiff did not sue under the Labor Management Relations Act. The amended complaint does not mention that act or the collective bargaining agreements between the defendant and the Teamsters. The amended complaint asserts in the preliminary statement that the plaintiff's "rights have been violated under Title I of the Americans with

Disabilities Act (ADA), 42 U.S.C. § 12112(b)(5)(a)," because "[the defendant] has failed on multiple occasions to provide reasonable accommodations to help [the plaintiff] in his work and [the defendant] has failed on multiple occasions to provide reasonable accommodations for [the plaintiff] such that he was denied a promotion to full time work." Dkt. No. 19 at 1.

Of the twenty-two paragraphs in the amended complaint, three mention the grievance procedure laid out in the CBAs. In paragraph 9, the plaintiff explains that he filed several grievances, two of which went "to a state level grievance panel, the Wisconsin Area Panel Grievance Committee, which ruled in [the plaintiff's] favor and ordered [the defendant] to provide appropriate sign language interpretation for [the plaintiff]." Id. at ¶9. The paragraph goes on to say that the Wisconsin Area Panel Grievance Committee "is an adjudicative body agreed to by UPS and Local Union 344 of which [the plaintiff] is a member." Id. Paragraph 10 states that the Grievance Committee's orders were followed only sporadically and that "there continues to be failure to provide interpretation for many meetings and [the plaintiff] is not provided with all the information his co-workers get in their daily briefings." Id. at ¶10. Finally, paragraph 12 states that because the defendant failed "to adhere to the Grievance Committee's orders," the plaintiff often misses necessary information, like schedule changes and information about how to participate in incentive programs. Id. at ¶12.

The defendant maintains that these paragraphs "implicate the CBA and its local rider agreement, subjecting [the plaintiff's claims] to the Labor

Management Relations Act's ("LMRA") exhaustion requirement." Dkt. No. 23 at 7. The LMRA, as the title of 28 U.S.C. §185 (§301) suggests, governs "suits by and against labor organizations." The amended complaint does not name a labor organization as a defendant. Nor is it a suit by a labor organization. But §301 of the LMRA "allows employees to bring suit against employers and labor unions for violations of a [collective bargaining agreement]." Watts v. United Parcel Service, Inc., 701 F.3d 188, 191 (6th Cir. 2012). And the Seventh Circuit has recognized that even if a plaintiff does not sue a union, his lawsuit may "unavoidably implicate" the union. Bell v. DaimlerChrysler Corp., 547 F.3d 796, 803 (7th Cir. 2008). As the court explained,

> A section 301 lawsuit is an exception to a national labor policy that favors private rather than judicial resolution of disputes under collective bargaining agreements. *Republic Steel Corp v. Maddox*, 309 U.S. 650, 652-53 . . . (1965). Litigation is therefore considered the last resort in resolving such disputes. *E.g.*, *Vail v. Raybestos Prods. Co.*, 533 F.3d 904, 908 (7th Cir. 2008). [The employer] and [the labor union] have contracted to resolve most of their disputes through a grievance and arbitration process. Union members must avail themselves of these dispute-resolution mechanisms before turning to the courts for relief. *Id.* "Otherwise, the judiciary may marshal its scar[c]e resources to resolve disputes that the parties could have resolved privately." *Id.*

Id. at 803-804.

The defendant says that the defendant and the Teamsters have contracted to resolve ADA disputes through a grievance and arbitration process, and that the plaintiff's claims are a dispute governed by that contract. Even if the defendant is correct, several courts have held that that exhaustion requirement is not jurisdictional. In Staudner v. Robinson Aviation, Inc., the

17

Fourth Circuit held that "the exhaustion requirement under § 301(a) [of the LMRA] is a nonjurisdictional precondition to suit rather than a jurisdictional limit." Staudner v. Robinson Aviation, Inc., 910 F.3d 141, 148 (4th Cir. 2018). This is because "Congress has not 'clearly stated' that § 301(a)'s exhaustion requirement goes to a court's subject matter jurisdiction," and "[t]he Supreme Court's own treatment of the exhaustion requirement confirms that it is nonjurisdictional in nature." Id. at 147.[2] The Sixth Circuit has noted that "the Supreme Court does not appear to treat the exhaustion requirement as jurisdictional in the § 301 context," and, at least prior to 2000, that court treated motions to dismiss in §301 cases for failure to exhaust as motions to dismiss for failure to state a claim under Rule 12(b)(6). Youseff v. Ford Motor Co., 225 F.3d 660 (Table), *3 n.3 (6th Cir. 2000). The Second Circuit has held that "[f]ailure to exhaust union grievance procedures is an affirmative defense, Johnson v. General Motors, 641 F.2d 1075, 1079 (2d Cir. 1981), not a jurisdictional bar." Sellers v. M.C. Floor Crafters, Inc., 842 F.2d 639, 642 n.2 (2d Cir. 1988). See also Paese v. Hartford Life and Acc. Ins. Co., 449 F.3d 435,

---

[2] "[T]he LMRA contains no explicit exhaustion requirement to accompany § 301. Nevertheless, the Supreme Court has to a degree embraced one for § 301 claims. In Republic Steel Corp. v. Maddox, 379 U.S. 650 . . . (1965), the Court 'looked to principles of federal common law,' Clayton [v. UAW], 451 U.S. [679] at 686 . . . [1981] (characterizing Republic), in requiring that an employee alleging a violation of the collective bargaining agreement between his union and employer exhaust exclusive grievance procedures contained in the bargaining agreement before bringing a § 301 suit on the alleged violation (or more accurately the employee 'must afford the union the opportunity to act on his behalf,' Maddox, 379 U.S. at 653 . . . .)." Stevens v. Nw. Ind. Dist. Council, United Bhd. Of Carpenters, 20 F.3d 720, 731 (7th Cir. 1994).

18

444 (2d Cir. 2006) ("Similarly, under the Labor Management Relations Act of 1947, *see* 29 U.S.C. § 185, the failure to exhaust labor union grievance procedures is an affirmative defense, rather than a jurisdictional bar."). Cf. National Football League Players Association v. National Football League, 874 F.3d 222, 226 (5th Cir. 2017) ("Our circuit holds that federal courts lack subject matter jurisdiction 'to decide cases alleging violations of a collective bargaining agreement . . . by an employee against his employer unless the employee has exhausted contractual procedures for redress.' *Meredith v. La. Fed'n of Teachers*, 209 F.3d 398, 402 (5th Cir. 2000)").

Although the Seventh Circuit does not appear to have addressed the question directly, it did consider the merits of a claim that a plaintiff had failed to exhaust his contractual remedies under the LMRA. In Roman v. U.S. Postal Serv., 821 F.2d 382, 386-390 (7th Cir. 1987), the court considered in detail the substance of the plaintiff/appellant's claim that the district court erred in granting summary judgment on the basis of his failure to exhaust. The Seventh Circuit also has noted, citing Clayton v. UAW, 451 U.S. 679 (1981), that "a court can excuse exhaustion if the plaintiff shows the futility of pursuing internal remedies." Hammer v. Int'l Union, United Auto., Aerospace and Agr. Implement Workers of America, 178 F.3d 856, 858 (7th Cir. 1999). This implies that the exhaustion requirement is not jurisdictional, because a court's subject matter jurisdiction cannot be forfeited or waived. Royce v. Michael R. Needle, P.C., 950 F.3d 939, 950 (7th Cir. 2020) (quoting Iqbal, 556 U.S. at 671). And as the Supreme Court recently noted, "the word 'jurisdictional' is generally

reserved for prescriptions delineating the classes of cases a court may entertain (subject-matter jurisdiction) and the persons over whom the court may exercise adjudicatory authority (personal jurisdiction)." <u>Fort Bend Cty. Tx. v. Davis</u>, ___ U.S. ___, 139 S. Ct. 1843, 1848 (2019) (citing <u>Kontrick v. Ryan</u>, 540 U.S. 443, 455 (2004)). While "Congress may make other prescription jurisdictional by incorporation them into a jurisdictional provision," <u>id.</u> at 1849, the Seventh Circuit has noted that Congress included no such prescription in §301 of the LMRA, <u>Stevens</u>, 20 F.3d at 731.

**Third**, it is not clear that even if the defendant and the Teamsters contracted to resolve ADA disputes through the grievance process laid out in the collective bargaining agreements, that contract would prevent the plaintiff from pursuing ADA claims in federal court. Section 301 of the LMRA preempts *state* rules regarding the meaning of CBAs because the "substantive principles of federal law must be paramount" when enforcing CBAs. <u>Local 174, Teamsters v. Lucas Flour Co.</u>, 369 U.S. 95 (1962). But if the "state-law claim can be resolved without interpreting the agreement itself, the claim is 'independent' of the agreement for § 301 preemption purposes." <u>Lingle v. Norge Div. of Magic Chef, Inc.</u>, 486 U.S. 399, 410 (1988). The LMRA has a broad preemptive effect over many state statutes. <u>See</u> <u>Roy Allen Slurry Seal v. Laborers Intern. Union of N. Am. Highway and Street Stripers/Road and Street Slurry Local Union 1184 AFL-CIO</u>, 241 F.3d 1142, 1146 (9th Cir. 2001).

The amended complaint asserts *federal* law claims—claims under the ADA. In <u>Watts</u>, the Sixth Circuit concluded that "§ 301 of the LMRA does not

preempt a claim brought in federal court under the ADA." <u>Watts</u>, 701 F.3d at 193. The plaintiff in <u>Watts</u> had suffered a back injury and was on leave for two years. <u>Id.</u> at 189. When her doctor cleared her for light duty work, she applied for the defendant's light-duty work program. <u>Id.</u> The defendant rejected her application; while the plaintiff claimed that she was rejected due to her disability, the defendant claimed that she was not eligible for the light-duty program based on language in the collective bargaining agreement. <u>Id.</u> at 189-190. The plaintiff's claims went to trial three times and were appealed twice. <u>Id.</u> at 190. On the last remand, the district court concluded that the plaintiff's ADA claim was preempted by §301 of the LMRA because it required interpretation of the CBA and because it was not filed within the six-month statute of limitations period for §301 actions. <u>Id.</u>

The Sixth Circuit reversed, explaining that

Congress's power to preempt state law is rooted in the Supremacy Clause of the United States Constitution. *Allis-Chalmers* [*Corp. v. Lueck*], 471 U.S. [202] at 208 [(1985)]. . . . The animating purpose of § 301 preemption is to ensure that federal labor law uniformly prevails over inconsistent interpretations of CBAs by state courts. *Lucas Flour*, 369 U.S. at 103–04 . . . ; *see also Valinski v. Detroit Edison*, 197 Fed. Appx. 403, 407–08 (6th Cir. 2006) (unpublished). When a claim asserts a right arising under federal law, and is filed in federal court, that rationale does not apply. *See Saridakis v. United Airlines*, 166 F.3d 1272, 1276 (9th Cir.1999) ("The preemption doctrine per se does not govern questions relating to the compatibility of two or more federal laws."); *cf. Proctor v. United Parcel Service*, 502 F.3d 1200, 1205 n.2 (10th Cir. 2007) ("Mr. Proctor's ADA claim is clearly not preempted by § 301 because one federal statute cannot preempt another[.]"). Because Watts's claim is based on a federal cause of action and is in federal court, there is no danger of divergent application of a CBA's provisions by state courts; thus, the motivating purpose of § 301 preemption simply does not apply.

21

Further, the right to be free from disability discrimination that Watts seeks to vindicate in this action does not arise from the CBA or from state law; rather, it is founded on the ADA. *O'Shea v. Detroit News*, 887 F.2d 683, 687 (6th Cir. 1989). A claim under the ADA is a separate, statutorily created federal cause of action independent from a CBA-based contract claim under the LMRA. Watts may have had a claim under the CBA, which she could have sought to vindicate according to the provisions of the CBA or by bringing a § 301 contract-based action under the LMRA. That contract right does not negate her statutory right. *See Atchison, Topeka & Santa Fe Ry. Co. v. Buell,* 480 U.S. 557, 565 . . . (1987) (holding that the Federal Employers' Liability Act provides "substantive protection . . . independent of the employer's obligations under its collective bargaining agreement").

Id., 701 F.3d at 191-92.

In its reply brief, the defendant asks the court to disregard Watts for two reasons: (1) the plaintiff in Watts had not filed grievances under the applicable collective bargaining agreements (unlike the plaintiff) and (2) the conclusion in Watts that the LMRA cannot preempt claims under federal law is "irreconcilable" with Seventh Circuit law. Dkt. No. 26 at 10. Neither argument is persuasive.

As to the first argument—that the plaintiff in Watts had not first tried to follow the grievance procedure under the collective bargaining agreement, while the plaintiff in this case has—the defendant asserts that "[w]hen, as here, a claim is intertwined with labor contracts, the LMRA's exhaustion requirement applies." Id. The plaintiff cites the Seventh Circuit's decision in Roman, 821 F.2d at 385-87. The plaintiff in Roman, an employee of the U.S. Postal Service, sued in federal court, asserting that the defendant had violated his due process rights by fraudulently inducing him to resign. Id. at 384. The Postal Service

22

moved to dismiss on the ground that the plaintiff had not exhausted his remedies. Id. The district court concluded that the plaintiff's due process claim "was necessarily a postal labor claim under 39 U.S.C. § 1208(b), that the Postal Service had breached the collective bargaining agreement," and dismissed for failure to exhaust the grievance procedures in that agreement. Id.

The Seventh Circuit found that postal employees had property interests in continued employment—interests that must be accorded due process protection. Id. at 386. The mechanism that created those property interests was "the collective bargaining agreement between the Postal Service and the Union, which provides that no employee shall be disciplined or discharged 'without just cause.'" Id. The court found that "[w]hen a postal employee is covered by a collective bargaining agreement the employee is limited to the due process protections provided by the grievance procedures in that agreement." Id. Concluding that Roman's due process claim arose out of his employment relationship with the Postal Service, and that that relationship was governed by the collective bargaining agreement that said employees could be terminated only for "just cause," the Seventh Circuit held that "[t]he district court correctly concluded that Roman's claim was necessarily one for breach of the collective bargaining agreement and that he was therefore limited to the due process protections provided in the agreement." Id.

As for the LMRA's exhaustion requirement, however, while the Seventh Circuit found that it applied, it did not (as the defendant suggests) base that finding on the fact that Roman's claim was "intertwined" with the labor

23

contracts. The Seventh Circuit simply stated, "The requirement of exhaustion of contractual remedies under § 301 of the Labor-Management Relations Act (LMRA), 29 U.S.C. § 185(a), applies to suits brought pursuant to the [Postal Reorganization Act]." Id. (citing McNair v. U.S. Postal Serv., 768 F.2d 730, 735 (5th Cir. 1985), finding that the LMRA is "made applicable" to the relationship between the Postal Service and its employees' bargaining representatives "by the Postal Reorganization Act, 39 U.S.C. § 1209(a), (b).").

The plaintiff in this case is not an employee of the U.S. Postal Service. He has not brought suit under the PRA. The Seventh Circuit's holding in Roman, that the LMRA exhaustion requirement applies to suits under the PRA, is not relevant to the plaintiff's claim, and the defendant points to no other authority for the proposition that if the plaintiff's claim is allegedly "intertwined" with labor contracts, the plaintiff must exhaust under the LMRA.

As to the defendant's second argument—the conclusion in Watts that the LMRA cannot preempt claims under federal law is "irreconcilable" with Seventh Circuit law—the defendant cites to Brown v. Ill. Cent. R.R. Co., 254 F.3d 654, 664 (7th Cir. 2001). Dkt. No. 26 at 10. The defendant asserts that in Brown, the Seventh Circuit recognized under the Railroad Labor Act's "identical exhaustion provision" that an employee must use the CBA's dispute resolution procedures "where an ADA claim requires the court to construe a labor agreement." Id.

The plaintiff in Brown was a railway worker; he brought an ADA claim which the district court dismissed for lack of subject-matter jurisdiction,

finding that the claim was precluded by the mandatory arbitration provisions of the Railway Labor Act. Id. at 655. The Seventh Circuit stated that the "sole issue" on appeal was whether the mandatory arbitration provisions of the RLA precluded the plaintiff from bringing his ADA claim in federal court (rather than resolving it through arbitration). Id. at 658. The court began by explaining that the RLA's arbitration provision established mandatory arbitration for the "prompt and orderly settlement" of two types of disputes: (1) major disputes (relating to the formation of the CBA); and (2) minor disputes ("growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules or working conditions."). Id. The defendant had argued in the district court—and the district court had agreed—that resolution of the plaintiff's ADA claim required interpretation of some provisions of the collective bargaining agreement, such as whether the plaintiff was able to perform the essential functions of the job given the CBA's requirements for his position. Id. at 659. The plaintiff disputed the defendant's interpretation of the CBA as requiring seven-day-a-week availability for his position. Id. The district court also had found that in order to determine whether the accommodation the plaintiff sought was reasonable, it would have had to interpret the section of the CBA that allowed employees in the plaintiff's position to be absent from work. Id. The defendant listed several other CBA provisions that it believed would need to be interpreted to resolve the plaintiff's ADA claim. Id.

The Seventh Circuit stated that while it did not "accept all of [the defendant's] arguments," it agreed that the resolution of the plaintiff's ADA

claim depended "in one crucial respect upon interpretation of the CBA." Id. at 661. Comparing the CBA's requirement that "when a change is made in the number of days the run is bulletined to operate each week, it will be considered a new run and bulletined accordingly" with the plaintiff's request for an accommodation allowing him to "lay off" for two days per week (id. at 657-68), the Seventh Circuit concluded that "it seems quite possible that the accommodation that Brown seeks would create a new position that is subject to bidding under the CBA." Id. at 661. The court speculated that "allowing Brown to lay off in the manner that he requests without first offering the same layoff privileges to more senior trainmen might very well violate the seniority system established by the CBA." Id. The court found this possibility particularly likely

> given that Brown requests regular layoffs of up to two days per week, and the regular . . . trainman position (which at the time of Brown's disqualification was held exclusively by trainmen with greater seniority than Brown) has only one assigned day off per week. Moreover, and most important for our purposes, the determination of whether or not Brown's requested accommodation would violate the seniority provisions of the CBA will potentially be dispositive of Brown's ADA claim, because requested accommodations which would interfere with the bona fide seniority rights of other employees are unreasonable as a matter of law, and not mandated by the ADA. See Eckles [v. Consolidated Rail Corp.], 94 F.3d [1041,] at 1051 [(7th Cir. 1996)]. Therefore, the adjudication of Brown's ADA claim cannot go forward until Article 55 and the seniority provisions of the CBA are interpreted, and the court's interpretation of those provisions could conclusively resolve Brown's claim, making it a "minor dispute" under the RLA.

Id.

The Seventh Circuit specifically addressed the question of whether the RLA "preempted" the ADA claim. Id. at 662. It found that "[t]he standard

26

established for the RLA's preemption of state law will not by itself conclusively resolve the question of whether the RLA precludes another federal claim, because the latter question requires courts first to analyze the two federal statutes in an effort to ascertain Congressional intent." Id. The court held that the issue before it was not a pure preemption question; rather, Brown's circumstances required the court to decide whether the RLA "*precludes* a claim brought under another federal statute, and this choice 'requires an analysis of both [federal statutes], to see if they are indeed incompatible or if they can be harmonized, and if they are incompatible to decide which one Congress meant to take precedence.'" Id. (quoting Coker v. Trans World Airlines, Inc., 165 F.3d 579, 583-84 (7th Cir. 1999)).

Significantly, the Seventh Circuit stated that "under the established RLA preemption/preclusion rule, the RLA will not bar a plaintiff from bringing an independent state or federal claim in court unless the claim could be 'conclusively resolved' by the interpretation of a CBA (that is, unless the interpretation of some provision(s) of the CBA could be dispositive of the plaintiff's claim)." Id. at 664. The Seventh Circuit held:

> It remains true *as a general rule* that the RLA will not bar a plaintiff from bringing a claim under an independent federal statute in court (because such claims are generally independent of the CBA and will be adjudicated under non-CBA standards). However, this rule no longer applies if the federal claim asserted by the plaintiff depends for its resolution on the interpretation of a CBA. Such claims are not "independent" of the CBA regardless of their source, and are therefore precluded by the RLA.

> We close by stressing the limited scope of our holding. A claim brought under an independent federal statute is precluded by the RLA only if it can be dispositively resolved through an interpretation

27

of a CBA. This occurs "only when a provision of the collective bargaining agreement is the subject of the dispute or the dispute is substantially dependent upon an analysis of the terms of a collective bargaining agreement." *Loewen* [*Group Int'l, Inc. v. Haberichter*], 65 F.3d [1417], at 1423 [(7th Cir. 1995)] (citations omitted). Therefore, an employer cannot ensure the preclusion of a plaintiff's claim merely by asserting certain CBA-based defenses to what is essentially a non-CBA-based claim, *see id.*, or by arguing that the action challenged by the plaintiff is "arguably justified" by the terms of a CBA. *See Hawaiian Airlines* [*Inc. v. Norris*], 512 U.S. [246], at 265-66 . . . [(1994)]. Nor will a claim be precluded merely because certain provisions of the CBA must be examined and weighed as a relevant but non-dispositive factor in deciding a claim or a defense. Therefore, Brown's claim would not have been precluded if either the parties did not dispute the interpretation of the relevant CBA provisions (and Brown had merely argued that he was entitled to a certain reasonable accommodation under the ADA *notwithstanding* anything to the contrary in the CBA), or if the disputed provisions of the CBA were relevant but not dispositive of Brown's claim (as the CBA's provisions describing job functions are in relation to the ADA "essential function" determination). However, because in this case the interpretation of the CBA's seniority provisions could dispose of Brown's entire ADA claim as a matter of law, his claim is not truly "independent" of the CBA and is precluded by the RLA.

Id. at 667-68.

Two years after deciding Brown, the Seventh Circuit held that the RLA does not preclude a claim under Title VII. Carlson v. CSX Transp. Inc., 758 F.3d 819, 833 (7th Cir. 2014). In Carlson, the court explained that even if the plaintiff did not have the qualifications specified in the collective bargaining agreement (and the defendant relied on the CBA in rejecting her bid), she still would have viable Title VII claims if the "same potentially disqualifying attributes have been overlooked for men or for others who have not complained about discrimination." Id., 758 at 833. The plaintiff's claims in Carlson did not fall within the Brown exception "to the general rule that the RLA does not require arbitration of claims asserting rights established by state or federal law

28

independent of a collective bargaining agreement." <u>Id.</u> The court said, "As we were careful to clarify in *Brown*, a claim is not barred simply because 'the action challenged by the plaintiff is "arguably justified" by the terms of the CBA.'" <u>Id.</u> It concluded by emphasizing that "RLA preclusion, properly applied, does nothing more than keep disputes actually arising under a collective bargaining agreement out of court." <u>Id.</u>

District courts have applied this reasoning. Recently the Northern District of Illinois held that the RLA does not preclude independent claims such as those involving "statutory protections against employment discrimination and retaliation." <u>Lyles v. Ne. Ill. Reg'l Commuter R.R. Corp.</u>, No. 19 C 3185, 2020 WL 7260801, *3 (N.D. Ill. Dec. 10, 2020). In September of last year, another Northern District of Illinois court found that ADA and FMLA claims were not precluded by the arbitration clause of the RLA because the claims did not involve disputes over the terms of the CBA but rather a settlement agreement negotiated through the grievance procedures. <u>Abudayyeh v. Envoy Air, Inc.</u>, No. 19 C 5802, 2020 WL 5819868, *4 (N.D. Ill. Sep. 30, 2020). The plaintiff wasn't quarreling with the CBA grievance procedures; rather, she argued that the settlement agreement made pursuant to the grievance procedure was evidence of the discrimination she experienced. <u>Id.</u>

While it is not binding, the court finds the <u>Watts</u> decision persuasive against the backdrop of Seventh Circuit jurisprudence discussed above, and the defendant's rationales for why the court should ignore it stretch Seventh Circuit precedent beyond its tolerance. The defendant reads <u>Brown</u> too

broadly—more broadly than the Seventh Circuit has stated that it should be read. The defendant has not identified any provision of the CBA that would need to be reinterpreted, or applied differently to other, similarly situated employees, if the court were to rule on the plaintiff's ADA claim.[3] The first amended complaint alleges that the defendant repeatedly failed to provide interpreters for meetings and other employment functions when requested and refused to provide notes on meetings without interpreters in violation of the ADA. The court does not need to interpret the CBAs to decide whether the defendant has violated federal law. Moreover, the plaintiff is not alleging in his second claim that the defendant failed to abide by the seniority bidding process in the CBA. The plaintiff alleges that he was treated differently from other employees during the examination process and that his tester said the defendant would never allow him to become a driver. The procedures employed during testing—not using the agreed upon gestures, putting notes in the plaintiff's face and requiring a longer test—are not governed by the CBAs. While the court may consult the CBAs or his prior grievances in resolving this case, a decision on the plaintiff's claims does not require interpretation of the CBAs.

---

[3] The defendant argues that pages 38 and 39 of the national agreement govern how the plaintiff must be reasonably accommodated and, if the defendant complied with those provisions, it could not violate the CBA. Dkt. No. 23 at 14 (citing Dkt. No. 24-1 at 49-50). These pages say nothing about *how* the defendant must accommodate a deaf, senior employee who is bidding on a driver position. That section simply outlines the procedure for accommodating a full-time employee who cannot be reasonably accommodated at full-time status.

b.    The CBA Arbitration Requirement

Although the court has found that the LMRA did not require the plaintiff to exhaust the CBA grievance procedure, the court also will address the other component of the defendant's exhaustion claim—the claim that the CBAs required him to arbitrate. Dkt. No. 23 at 15.

The defendant argues that the labor agreement—specifically Article 14, Section 3—"contains . . . a clear and unmistakable commitment of ADA claims to the CBA's grievance process." Id. The plaintiff responds that there are ambiguities in the language of the agreements and emphasizes that his ADA claim is independent of any claim arising under the CBAs or its procedures.

Both the CBAs—the National Agreement and its Rider— make clear that the grievance procedure applies to "grievances and/or questions of interpretation arising under the provisions of the National Master Agreement," dkt. No. 24-1 at 33, and "any controversy which might arise under this Agreement," dkt. no. 24-3 at 16. The National Agreement separately addresses claims under the ADA. The relevant section appears at Article 14, Section 3 (Permanently Disabled Employees):

> *The Parties agree to abide by the provisions of the Americans with Disabilities Act. The Company shall be required to negotiate with the Local Union prior to providing a reasonable accommodation to a qualified bargaining unit employee.*
>
> The Company shall make a good faith effort to comply in a timely manner with requests for a reasonable accommodation because of a permanent disability. Any grievance concerning the accommodation not resolved at the center level hearing will be referred to the appropriate Union and Company co-chairs for the Local Area or to the Region Grievance Committee, if applicable. If not resolved at that

31

level within then (10) days, the grievance shall be submitted directly to the National Safety and Health Grievance Committee.

If the Company claims that the individual does not fall within the protections of the Americans with Disabilities Act, then the grievance must follow the normal grievance procedure in order to resolve that issue before it can be docketed with the National Safety and Health Committee.

*Any claim in dispute concerning rights under this Section shall be addressed under the grievance and arbitration procedures of this Agreement. A grievance may be filed by an employee or the Union, notwithstanding any contrary provision in any Supplement, Rider or Addendum. The submission of a claim under this Section to the grievance and arbitration procedures of the Agreement shall not prohibit or impede an employee or the Union from pursuing their statutory rights under the Americans with Disabilities Act (ADA) or comparable state or local laws.*

The parties agree that appropriate accommodations under this Section are to be determined on a case-by-case basis.

If a full-time employee cannot be reasonably accommodated in a full-time job, the Company may offer a part-time job as a reasonable accommodation if the employee is qualified and meets the essential functions of the job. If the employee accepts the part-time accommodation, the employee will be placed in to the applicable part-time health & welfare and pension programs, will be paid the appropriate part-time rate for the job performed based on his company seniority, and will receive the part-time contractual entitlements as per the appropriate Supplement, Rider or Addendum using his Company seniority date. This placement will not prohibit the employee from bidding on future full-time jobs for which he is qualified and meets the essential functions of the job. Should the employee no accept the part-time reasonable accommodation, he shall be allowed to be inactive for three (3) years. During those three (3) years, he shall have the ability to return to his job should he become able to perform the essential functions of the job with or without a reasonable accommodation; have the ability to bid on openings as seniority allows, providing he can perform the essential functions of that job; and have the ability to accept the part-time accommodation referenced above. After three (3) years, his seniority shall be considered broken. Said employee shall be entitled to receive long term disability and workers' compensation in accordance with the terms of the application plan.

Dkt. No. 24-1 at 49-50 (emphasis added).

The section starts by stating a clear intent to abide by the ADA. Next, it requires the defendant to negotiate with the union prior to providing a reasonable accommodation and to make a good faith effort to timely comply with a request for reasonable accommodation. The section then lays out the procedure for making a grievance about a reasonable accommodation. It clarifies that the "normal grievance" procedure applies if the claim does not involve the ADA, implying that the parties contemplated a separate procedure for ADA claims.

The ambiguity arises in the next section: "[t]he submission of a claim *under this Section* to the grievance and arbitration procedures of the Agreement shall not prohibit or impede an employee or the Union from pursuing their statutory rights under the" ADA. Dkt. No. 24-1 at 49 (emphasis added). The agreement does not define what "claim under this Section" means. Does it mean a claim arising under Article 14, Section 3? That section does not appear to give rise to independent claims; it simply states an intent to abide by the ADA. Does it mean a claim arising under the ADA? If so, the last portion of the sentence would be unnecessary. The first paragraph of Article 14, Section 3 expresses a general intent to abide by the ADA but specifically mandates only negotiation with the union prior to providing a reasonable accommodation. Does a claim "under this section" mean an employee claim for a reasonable accommodation? Or a claim regarding the defendant's handling of such claims

(whether the company first negotiated with the union or how the claim was submitted or decided).

The section also provides that the submission of the claim to the grievance and arbitration procedures "shall not prohibit or impede an employee or the Union from pursuing their statutory rights under the Americans with Disabilities Act (ADA) or comparable state or local laws." Id. It is not clear whether that means that an employee may pursue his statutory rights under the ADA in arbitration or whether he may pursue his statutory rights in the courts. The CBAs could have stated that "nothing shall prohibit or impede the plaintiff from pursuing his rights under the ADA in arbitration" or that "arbitration is the sole and exclusive remedy for any claim under the ADA." They do not. While it is not explicit, the language suggests that nothing shall prohibit or impede the plaintiff from pursuing his rights under the ADA in any forum.

Despite these ambiguities, the defendant describes the CBA has stating a "clear and unmistakable commitment of the ADA claims to the CBA's grievance process." Dkt. No. 23 at 15. It bases that conclusion on the "shall be addressed under the grievance and arbitration procedures" language, without addressing what Article 14, Section 3 means by "any claim in dispute concerning rights under this Section." Id. at 16. In its brief, the defendant glosses over the next sentence, which explains that the submission of the claim to grievance and arbitration procedures "shall not prohibit or impede an employee or the union from pursuing their statutory rights under the" ADA. The defendant suggests

34

that this language merely enshrines the plaintiff's substantive rights while clarifying the procedural forum. Id. at 15-16. That is only one of several possible interpretations.

The same analysis applies to the defendant's assertion that the language of Article 14, Section 3 requires the plaintiff to submit his claims to arbitration. The plaintiff asserts that there is no requirement that he arbitrate his claims because the Supreme Court requires that any such language "must be particularly clear." Dkt. No. 25 at 7 (citing Wright v. Universal Maritime Serv. Corp., 525 U.S. 70 (1998)). The Seventh Circuit addressed this issue in Vega v. New Forest Home Cemetery, LLC, 856 F.3d 1130, 1134 (7th Cir. 2017).

In Vega, the plaintiff sued under the Fair Labor Standards Act (FLSA) and the district court entered summary judgment in favor of the defendant because it believed that there was a "generally established" rule that a union member had to follow the CBA procedures before bringing a lawsuit and because it found the plaintiff had not exhausted his contractual remedies. Id. at 1132. The Seventh Circuit recounted that in 14 Penn Plaza LLC v. Pyett, 556 U.S. 247, 263-64 (2009), the Supreme Court had moved away from the jurisprudence it had established in Alexander v. Gardner-Denver Co., 415 U.S. 36 (1974), Barrentine v. Arkansas-Best Freight Sys., Inc., 450 U.S. 728 (1981) and McDonald v. City of W. Branch, Mich., 466 U.S. 284 (1984)—cases that had suggested "that a collective bargaining agreement can never restrict an employee's access to the courts for the purpose of enforcing his statutory rights." Id. at 1133-1134. The Seventh Circuit noted that the Supreme Court

35

since had made clear in 14 Penn Plaza that those cases "did not resolve the question whether an agreement to arbitrate statutory claims is enforceable against an aggrieved employee who wishes to pursue such claims in court rather than by way of grievance and arbitration," and that 14 Penn Plaza had answered that question "in the affirmative, so long as the collective bargaining agreement explicitly states that an employee must resolve his statutory as well as his contractual rights through the grievance procedure delineated in his collective bargaining agreement." Id. at 1134 (citing 14 Penn Plaza, 556 U.S. at 263-64). The Vega court emphasized, however, that "the language of the [collective bargaining] agreement in this regard must be clear and unmistakable in order for it to be enforced by an employee who wishes to bypass the contractual dispute resolution process in favor of a judicial forum." Id. (citing 14 Penn Plaza, 556 U.S. at 274).

The Seventh Circuit reversed the grant of summary judgment in Vega, finding that the CBA did not "clearly and unmistakably require an employee to resolve a statutory claim through the grievance procedure. Id. at 1135. The court found that while section 8.1 of the CBA at issue defined a grievance to include a claim or dispute "concerning pay, hours, or working conditions or the interpretation or application of this Agreement," that language could be read to mean a claim over the requirements of the contract itself rather than a claim about what the FLSA required. Id. The court thought the more natural reading of that language was in reference to a claim over the contractual requirements, because the CBA did not refer to the FLSA. Id. The court concluded, "Under no

36

sense of the phrase 'clear and unmistakable' can the agreement be read to compel an employee to resolve his rights under FLSA through the grievance process." Id.

The defendant argues that the language in Article 14, Section 3 constitutes a clear waiver of the plaintiff's right to bring his statutory claims in federal court, a waiver "just as clear" as the language that compelled arbitration in 14 Penn Place and Safrit v. Cone Mills Corp., 248 F.3d 306, 307-08 (4th Cir. 2001)). Dkt. No. 23 at 16-17. The court disagrees. The arbitration provision in 14 Penn Pace contained the following language:

> ¶ "30. NO DISCRIMINATION ¶ "There shall be no discrimination against any present or future employee by reason of race, creed, color, age, disability, national origin, sex, union membership, or any characteristic protected by law, including, but not limited to, claims made pursuant to Title VII of the Civil Rights Act, the Americans with Disabilities Act, the Age Discrimination in Employment Act, the New York State Human Rights Law, the New York City Human Rights Code, ... or any other similar laws, rules or regulations. *All such claims shall be subject to the grievance and arbitration procedure (Articles V and VI) as the sole and exclusive remedy for violations.* Arbitrators shall apply appropriate law in rendering decisions based upon claims of discrimination."

556 U.S. at 252 (emphasis added). The 14 Penn Place provision specifically and clearly stated that claims under Title VII, the ADEA and other similar laws "shall be subject to the grievance and arbitration as the sole and exclusive remedy for violations." Id. There is nothing ambiguous about that provision. Similarly, in Safrit, the relevant provision stated:

> that the company and the union "agree that they will not discriminate against any employee with regard to race, color, religion, age, sex, national origin or disability.... The parties further agreed [sic] that they will abide by all the requirements of Title VII of the Civil Rights Act of 1964." Section XX further noted, "Unresolved

37

> grievances arising under this Section are the proper subjects for arbitration."

Safrit, 248 F.3d at 307. The provision did not include the sentence that appears in the CBA in this case: that the submission of a claim under this section "shall not prohibit or impede an employee or the union from pursuing their statutory rights" under the ADA.

Article 14, Section 3 does not articulate a clear intent to require employees to submit ADA claims to the grievance process, nor does not contain a clear waiver of an employee's right to pursue an ADA claim in the federal court.

### c.    Ripeness

Finally, the defendant argues that the court does not have subject-matter jurisdiction because the plaintiff's claims are not ripe. Dkt. No. 23 at 17. The defendant argues that the plaintiff has not attempted to redress all his allegations through the grievance system and that if he did, the possibility exists that the labor-management committee would agree with him. Id. at 18. The plaintiff *did* file grievances on the failure to provide interpreters and the lack of communication, and although two of those grievances made it to the state grievance panel, which ruled in the plaintiff's favor and ordered the defendant to provide interpretation, dkt. no. 19 at ¶9, and the defendant suggests these prior victories suggest that if the plaintiff again used the grievance system, there is a "possibility" that he might again prevail, mooting these "parallel" proceedings in federal court, dkt. no. 23 at 18.

38

The plaintiff responds that he filed his employment discrimination complaint with the EEOC in early 2017. Dkt. No. 25 at 16 (citing Dkt. No. 19 at ¶¶4, 6). He recounts that he alleged the defendant failed to reasonably accommodate him by failing to provide interpreters for important workplace communications and alleged that he had been denied an interpreter for the driving road tests that he took and that he had been treated differently than non-disabled employees in the road tests. Id. (citing Dkt. No. 19 at ¶¶6-18). He recounts that on April 1, 2019, the EEOC issued a charge finding reasonable cause to believe the defendant had violated the ADA. Id. at 17 (citing Dkt. No. 19 at ¶4. He asserts that on August 29, 2019, the EEOC issued its notice of right to sue and that in November 2019, the plaintiff filed this complaint. Id. The plaintiff argues that nothing in the ADA requires him to exhaust collective bargaining remedies prior to filing suit and that his claims are ripe for judicial review. Id. He notes that if he had failed to file this federal suit within 300 days as required by the ADA, his ability to access the federal court forum would have been barred; he points out that the 300-day period would not have been tolled while he proceeded with an internal grievance procedure. Id.

"Ripeness doctrine is based on the Constitution's case-or-controversy requirements as well as discretionary prudential considerations." Wisc. Right to Life State Political Action Comm. v. Barland, 664 F.3d 139, 148 (7th Cir. 2011). "A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'" Texas v. United States, 523 U.S. 296, 300 (1998).

The plaintiff took all the necessary steps to file an ADA claim: he filed his claims with the EEOC and received a notice of right to sue with a finding of reasonable cause. The plaintiff has suffered a concrete and particularized injury. The injuries he alleges are not hypothetical or illusory; the plaintiff requested an ASL interpreter, he grieved the failure to accommodate and prevailed twice, he applied three times for the driving position, he requested accommodations in testing and he failed the driving test twice without accommodations. He alleges that others were tested under different conditions, allowed to practice and accommodated.

The defendant argues that the plaintiff must repeatedly return to a process that has failed him. Twice the state panel has agreed with the plaintiff and ordered the defendant to provide accommodation. Yet the plaintiff alleges that the defendant still has failed to address his needs. It is not clear why the defendant believes that a third—or fourth or fifth—trip through the grievance process would make a difference. The defendant's argument has little to do with ripeness. The plaintiff's claims are ripe.

d.    Conclusion

The LMRA exhaustion requirements do not apply. The CBAs do not clearly state a waiver of the plaintiff's right to pursue his ADA claims in federal court. And the plaintiff has attempted to exhaust the grievance process without success, so his claims are ripe. The court will deny the defendant's motion to dismiss for lack of subject-matter jurisdiction under Rule 12(b)(1).

2.     *Rule 12(b)(6)—Failure to State a Discrimination Claim*

The defendant argues that even if the court has subject-matter jurisdiction, the court should dismiss because the plaintiff has failed to state a discrimination claim. Dkt. No. 23 at 19. The defendant asserts that as to the plaintiff's failure to accommodate claim, he has not alleged an adverse employment action. Id. The defendant asserts that as to the failure-to-promote claim, the plaintiff has not stated facts showing that he was otherwise qualified to perform the essential functions of the job. Id. at 20.

a.     Adverse Action

The defendant argues that in order to state a claim for failure to accommodate under the ADA, the plaintiff must allege that he suffered an "adverse employment action." Dkt. No. 23 at 19. The Seventh Circuit has distinguished between the different types of ADA claims and articulated the pleading requirements. In January of 2020, the Seventh Circuit explained:

> The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Discrimination can take the form of treating a disabled employee differently from other workers or failing to make reasonable accommodations to the known limitations of the employee. *See* § 12112(b); e.g., *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019). [The plaintiff] is pursuing a failure-to-accommodate claim. To prevail on such a claim, [he] must show (1) he was a qualified individual with a disability, (2) his employer was aware of his disability, and (3) the employer failed to reasonably accommodate his disability. E.g., *Rowlands v. U.P.S. - Ft. Wayne*, 901 F.3d 792, 798 (7th Cir. 2018).

41

<u>Youngman v. Peoria Cty.</u>, 947 F.3d 1037, 1041-42 (7th Cir. 2020). The Seventh Circuit does not require a plaintiff pursing a failure-to-accommodate claim to allege an adverse action.

The plaintiff has satisfied the Seventh Circuit's pleading requirements. He alleges that he was a qualified individual with a disability (he is deaf), that the defendant was aware of his disability and previously provided ASL interpreters at another location, that the plaintiff requested an ASL interpreter for meetings and grieved the requested accommodation twice and the defendant continues to ignore his requests. While the defendant alleges that the plaintiff has made only a "generic statement that 'misse[d] information conveyed at meetings' would 'enable [the plaintiff] to better complete his work duties,'" dkt. no. 23 at 20 (citing dkt. no. 19 at ¶12), that is enough at the pleadings stage; the defendant's argument is more suited to summary judgment or trial. In fact, the case cited the defendant from this district was resolved by Judge Duffin on summary judgment. Dkt. No. 26 at 19 (citing <u>Ott v. H&M Hennes & Mauritz LP</u>, No. 14-CV-556, 2015 WL 6393821 (E.D. Wis. Oct. 22, 2015)). The defendant argues that it raised the failure to plead an adverse action in its first motion to dismiss and that "its continuing absence is a tacit concession that [the plaintiff] cannot plead this essential element of his claim." <u>Id.</u> at 20. But because an adverse action is *not* an essential element of the claim, the fact that the plaintiff didn't plead it in the amended complaint is irrelevant.

42

Absent evidence that the Seventh Circuit has reversed or modified its holding in Youngman, the plaintiff's failure to plead an adverse action is not a basis for dismissal under Rule 12(b)(6).

b.     Otherwise Qualified

As to the plaintiff's failure-to-promote claim, the defendant asserts that the plaintiff failed to allege that he was "otherwise qualified to perform the essential functions of the job with or without reasonable accommodation." Dkt. No. 23 at 20 (citing Roberts v. City of Chi., 817 F3d 561, 565 (7th Cir. 2016)). The defendant argues that the plaintiff was required to plead something more than that he passed the physical exam and had a hearing exemption; the defendant argues that the plaintiff needed to plead that the defendant participates in the FMCSA's experimental hearing-exemption program or that the plaintiff can otherwise meet the defendant's physical requirements for drivers. Id. at 21-22.

To state a discrimination claim under the ADA, the plaintiff must allege that (1) he is disabled within the meaning of the ADA; (2) he is qualified to perform the essential elements of the job, either with or without reasonable accommodation; and (3) he suffered an adverse employment action because of his disability. Hoppe v. Lewis Univ., 692 F.3d 833, 839 (7th Cir. 2012). The plaintiff has pled facts to support each of these elements. He alleges that he is deaf and disabled within the meaning of the ADA. Dkt. No. 19 at ¶7. He alleges that he is qualified to perform the essential functions of the job with reasonable accommodations. Id. at ¶13. He alleges that he sought and was granted a

43

Hearing Exemption from the Federal Motor Carrier Safety Administration (FMCSA) and passed the requisite physical test. Id. at ¶14. He holds a valid Wisconsin driver's license. Id. He was denied accommodations and failed the driving test twice. Id. at ¶¶15-17.

The defendant asks the court to impose a heightened pleading standard and to find, as a matter of law, that the plaintiff could never be a qualified individual. The defendant relies on Albertson's Inc. v. Kirkingburg, 527 U.S. 555 (1999). In Albertson's, the Supreme Court considered a case involving a truck driver who failed to meet the U.S. Department of Transportation's visual acuity standards. The plaintiff, a truck driver, applied for a Federal Vision Waiver, but the defendant terminated him before he received a response to his waiver application. Id. at 560. He eventually received the waiver, but the defendant refused to rehire him. Id. The plaintiff sued, arguing that his termination violated the ADA. Id. The defendant moved for summary judgment on the sole ground that the plaintiff was not "otherwise qualified' to perform the job of truck driver with or without reasonable accommodation. Id. The Supreme Court found that at the summary judgment stage, the defendant could rely on the applicable DOT safety regulations to justify its standards for drivers. Id. at 574. The defendant also cites Denton v. Chi. Transit Auth., 400 F. App'x 90, 92 (7th Cir. 2010), which cited Albertson's for the proposition that "[t]he Supreme Court has recognized that an employer may rely on DOT medical qualifications in defining the essential job functions of a commercial driver."

44

Albertson's and Denton were decided at the summary judgment stage—the stage of litigation when the court examines the evidence proffered by the parties. This court is not considering a summary judgment motion, or even a motion for judgment on the pleadings under Fed. R. Civ. P. 12(c). At this stage, the court looks only to the allegations in the complaint to determine whether the plaintiff has stated a claim.

The defendant faced a situation remarkably like this in Pagenkopf v. United Parcel Service, Inc., Case No. 17-1081 (DWF/SER), 2019 WL 288119 (D. Ct. Minn. Jan. 22, 2019). The plaintiff in Pagenkopf was a deaf employee working for the defendant who alleged discrimination after he failed in his bid to become a driver. He was born "profoundly deaf," used ASL as a primary language, could hear sounds with hearing aids but not words and communicated in writing at work. Id. at *3. Notably, the defendant provided a sign language interpreter for Pagenkopf when he needed to communicate for an extended period, such as in trainings or meetings with human resources. Id. The defendant argued on summary judgment that the plaintiff's claims failed because he could not perform an essential function of the driving job (customer communication) with or without reasonable accommodation. The defendant argued that "Jeffrey Pagenkopf is a valued UPS employee. But Pagenkopf—who is profoundly deaf—is not qualified to perform the essential functions of a package car driver." Case No. 17-cv-1081, Dkt. No. 44 at 1. Although the defendant was represented by a different law firm, it still argued that that the plaintiff could not complete the training because he was deaf and that any

45

proposed accommodations would require the defendant to abandon its training requirements. Case No. 17-cv-1081, Dkt. No. 83. The Minnesota district court denied summary judgment because the question of whether the plaintiff could perform the essential functions of the job—with reasonable accommodations— was a question for the jury. 2019 WL 28819, at *8, 9.

If the defendant's argument was not sufficient to prevail on summary judgment, it certainly is not sufficient to prevail on a Rule 12(b)(6) motion to dismiss. The defendant asks this court to disregard Pagenkopf because the parties in that case did not argue whether the defendant had to accept a hearing exemption. That is a distinction without a difference; in its findings of fact, the Minnesota court found that the plaintiff could not be interstate certified because the federal government did not have a hearing-impaired waiver at that time. Case No. 17-cv-1081, Dkt. No. 91.

### c.    Conclusion

The plaintiff's allegations are sufficient to state claims for failure to accommodate and failure to promote. The court will deny the defendant's motion to dismiss for failure to state a claim under Fed. R. Civ. P. 12(b)(6).

### 3.    *Eligibilitly for Declaratory Relief*

Finally, the defendant asked the court to strike the request at the end of the amended complaint, which seeks a declaration that the defendant's "policies and regulations . . . discriminate against otherwise qualified person [sic] because of their disability. Dkt. No. 23 at 22 (citing Dkt. No. 19 at  page 6, sub B). The defendant argues that the amended complaint does not identify

46

any policies or regulations and argues that the plaintiff left out of the first amended complaint the allegation from the original complaint that the Wisconsin Area Panel Grievance Committee had ordered the defendant to follow its own accommodation process. Id. (citing Dkt. No. 1 at ¶9).

The amended complaint alleges two claims: reasonable accommodation and discrimination. Dkt. No. 19. Federal Rule of Civil Procedure 57 states that the existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate. But the amended complaint does not identify any policies or regulations for the court to declare in violation of the ADA and does not assert a claim for declaratory relief, nor did the plaintiff respond to the defendant's arguments on this issue. The court will grant the defendant's motion to the extent it will strike the request for declaratory relief.

## III.    Next Steps

Because the court has declined to dismiss the amended complaint, the next step is for the defendant to answer. That said, the court encourages the parties to consider mediation. The facts are relatively straightforward and the defendant has litigated a similar case in another federal court. If the parties would like to take advantage of the court's magistrate judges—all of whom are conducting remote mediations via Zoom videoconference—they need only jointly contact the court (either by telephone or by stipulation) and ask for a referral to a magistrate judge. The court is able to accommodate such requests in short order.

## IV.     Conclusion

The court **DENIES** the defendant's motion to dismiss Counts One and Two of the first amended complaint. Dkt. No. 22.

The court **GRANTS** the defendant's request to strike from the first amended complaint the plaintiff's request for declaratory relief. Dkt. No. 23 at 22-23.

Dated in Milwaukee, Wisconsin this 23rd day of March, 2021.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**